IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WILKINSON INDUSTRIES, INC., | 8:06CV405 |
| Plaintiff, | |
| vs. | |
| TAYLOR'S INDUSTRIAL SERVICES, LLC, d/b/a HPM, a division of TAYLOR'S INDUSTRIAL SERVICES, LLC and THE CINCINNATI INSURANCE COMPANY, | MEMORANDUM AND ORDER |
| Defendants, | |
| THE CINCINNATI INSURANCE COMPANY, | |
| Defendant and Third-Party Plaintiff, | |
| vs. | |
| TAYLOR'S PROPERTY MANAGEMENT, LLC; TAYLOR TOWING & HEAVY HAULING, LLC; D&G TOWING AND RECOVERY, INC.; CHRISTOPHER A. FILOS; JOSEPH A. FILOS, JR.; and DOUGLAS E. FILOS, | |
| Third-Party Defendants. | |

Before the court is defendant Cincinnati Insurance Company's ("Cincinnati Insurance") motion to enforce a settlement agreement between itself, the plaintiff Wilkinson Industries, Inc. ("Wilkinson"), and defendant Taylor's Services, L.L.C., d/b/a HPM, a division of Taylor's Industrial Services, L.L.C. ("HPM"). Filing No. 92. Additionally, Cincinnati Insurance requests that the court dismiss the ancillary claims for lack of supplemental jurisdiction. HPM and Taylor's Property Management, Taylor Towing & Heavy Hauling, LLC, D&G Towing and Recovery, Inc., Christopher A. Filos, Joseph A.

Filos, Jr., and Douglas E. Filos (collectively the "Indemnitors") filed a brief in opposition to the motion to enforce the settlement agreement arguing that Cincinnati Insurance waived a provision requiring the deposit of collateral and that the amount of the settlement exceeded the surety bond. This court must determine if the settlement agreement between Cincinnati Insurance and Wilkinson is enforceable.

## FACTS

Wilkinson is a Delaware corporation with its principal place of business in Fort Calhoun, Nebraska. Defendant Taylor's is an Illinois limited liability company with its principal place of business in Tinton Falls, New Jersey. HPM is a division of Taylor's. HPM contracted with Wilkinson for the performance bond discussed hereinafter. Defendant Cincinnati Insurance is an Ohio Corporation and is the surety under the performance bond.

Wilkinson manufactures a line of food service packaging products including plastic containers, aluminum foil containers and aluminum rolls and pop-ups. These containers are made through a process called thermoforming. A thermoplastic sheet is heated until it becomes soft enough to mold using a thermoforming machine. The sheet can be purchased from outside vendors or made in-house. Taylor's HPM division manufactures heavy-duty equipment, including what is known as extrusion lines for the manufacturing of sheet line systems for its customers' particularized needs.

Sometime in October 2004, Wilkinson and HPM entered into discussions regarding the manufacture and supply of a new co-extrusion sheet line system that would meet Wilkinson's custom needs. As a result Wilkinson would no longer have to purchase sheet from outside sources. On December 23, 2004, Wilkinson purchased the sheet line system

2

from HPM.  Filing No. 1, Ex. 1.  HPM confirmed this order.  Filing No. 1, Ex. 2.  The sheet line system was to be shipped within 24 to 26 weeks from the date of the purchase order, which would have been by June 23, 2005.  Wilkinson agreed to pay $1,410,431 for the sheet system in the following installments:  (a) 25% as a line of credit ($352,607.75) to start the job; (b) 20% for the assembling of and completing one-half of the work ($282,086.20); (c) 25% prior to the shipment of the sheet line system ($352,607.75); (d) 15% upon acceptance of the sheet line system ($211,564.65); and (e) 15% due 120 days from shipment of the system ($211,564.65).  Wilkinson made the first two payments in the amount of $634,693.95.

As part of the contract, Wilkinson required HPM to provide a performance bond.  On March 16, 2005, the performance bond was issued on behalf of and for the benefit of Wilkinson by HPM, as the principal, and Cincinnati Insurance as the surety.  Filing No. 1, Ex. 3.

Wilkinson contends that thereafter HPM failed to ship the sheet line system within the 26-week period of time.   However, Wilkinson also contends that it continued to work with HPM to obtain the sheet line system.  On July 29, 2005, Wilkinson notified Cincinnati Insurance that HPM had breached the contract and Wilkinson considered HPM in default for failure to comply with the terms of the contract.  Section 3.1 of the performance bond required a conference withing fifteen days of receipt of the letter to Cincinnati Insurance. Wilkinson and Cincinnati met but HPM refused to meet.  In late August Wilkinson and Cincinnati inspected the unfinished sheet line at HPM's plant.  On September 1, 2005, Wilkinson contacted HPM and Cincinnati Insurance and declared HPM in default pursuant to Section 3.2 of the Performance Bond.  In accordance with Section 3.3 of the

performance bond, Wilkinson notified Cincinnati Insurance of its willingness to pay the balance of the contract amount. Thereafter, on September 30, 2005, Cincinnati Insurance elected to have HPM finish the contract in accordance with Section 4.1 of the performance bond. HPM then represented it was ready to ship the sheet line system, but HPM refused to ship the system without full payment and a release from liability for its failure to perform and for late delivery. Wilkinson declined.

As a result of these problems, Wilkinson, HPM and Cincinnati Insurance entered into a November 9, 2005, agreement regarding finishing and delivering the sheet line system. Filing No. 1, Ex. 7. As part of the agreement, Wilkinson paid the third installment with two change orders in the amount of $372,575 ($19,967 for change orders), and HPM agreed to assist Wilkinson with setup, installation, and training at Wilkinson's factory. In late November/early December, HPM shipped the system to Wilkinson.

Wilkinson contends it received a damaged and incomplete sheet line system. In particular, HPM left water in the parts of the system that froze while in-transit when crossing through the freezing temperatures in the Midwest. Many parts were allegedly damaged. Many of the other parts were disassembled and not inventoried, lying loose in the truck. Certain pieces were not shipped, and the assembly files were not provided. Wilkinson then again wrote Cincinnati Insurance. Wilkinson hired an expert engineer, David R. Hopkins, who concluded the system had significant damage and would cost substantial money and time to repair. Filing No. 1, Ex. 9. Cincinnati Insurance hired its own expert, Jack Krafchick, P.E., to inspect the sheet line system. Mr. Krafchick was of the opinion that HPM had substantially complied with the contract. Consequently, Cincinnati Insurance, on January 11, 2006, denied coverage. Thereafter, Wilkinson had

to test the parts at its own expense and without the assistance of HPM. As of the date of the complaint, the two letters of credit securing the last two payments of the contract were being held in escrow by Cincinnati Insurance in the amount of $423,129.30.

Wilkinson alleged the following theories in this case against HPM: breach of contract - pre-delivery damages; breach of contract - post-delivery damages; breach of express warranty; breach of implied warranty; and declaratory judgment that the performance bond between Wilkinson and Cincinnati Insurance is valid, binding and enforceable. Wilkinson also asked this court to all it to recoup the monies currently held by Cincinnati Insurance for the two letters of credit for the final two payments to HPM.

Cincinnati Insurance filed an answer as well as a cross-claim against HPM. Filing No. 15. Cincinnati Insurance alleged that HPM is required pursuant to paragraph 20 of the Agreement of Indemnity to deposit with Cincinnati a sum of money equal to the reserve established by Cincinnati, which amounts to $1,560,431. HPM has failed to file the required collateral.

Cincinnati Insurance then filed a third-party complaint against all the third-party defendants listed herein on the basis that each of them agreed, jointly and severally, to indemnify Cincinnati Insurance for the sum of money equal to any reserve established by Cincinnati Insurance, which amounts to $1,560,431. Filing No. 16. Cincinnati argues that none of the third-party defendants have met their indemnity obligations. Third-party defendants answered and filed a cross-claim against Cincinnati Insurance and a counterclaim against Wilkinson. Filing No. 23. The counterclaim alleges that Wilkinson owes HPM $423,129.30 and prejudgment interest and also alleges that Wilkinson violated an anti-disparagement clause by talking negatively about HPM. In its cross-claim, HPM

alleges that Cincinnati Insurance is unlawfully holding the letters of credit in the amount of $423,129.30 and prejudgment interest.

## DISPUTE CURRENTLY BEFORE THE COURT

On October 22, 2007, Cincinnati Insurance filed a motion to enforce settlement agreement and to dismiss ancillary claims. Filing No. 92. Cincinnati Insurance has now reached a settlement with Wilkinson of all the claims and counterclaims. Cincinnati Insurance contends that the Agreement of Indemnity provides that Cincinnati may pay or compromise claims and suits arising on bonds unless the Indemnitors give notice that the claim should be resisted and deposit collateral with Cincinnati Insurance sufficient to cover the claim. Filing No. 93, Ex. A. HPM argues that Cincinnati Insurance does not have the authority under the indemnity agreement to settle their claims, and in the alternative, argues the settlement amount exceeds the authority of the performance bond. HPM also argues that Cincinnati Insurance waived its collateralization rights under the indemnity agreement.

The Agreement of Indemnity, signed by the Indemnitors, contains three paragraphs that are central to the issue. The first, listed under "Indemnity," provides in relevant part:

> The Surety may pay or compromise any claim, demand, suit, judgment or expense arising out of such Bond or Bonds and any such payment or compromise shall be binding upon the Undersigned and included as a liability, loss or expense covered by this Indemnity Agreement, provided the same was made by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all of the circumstances. . . . If the Undersigned desire that a claim or demand against the Surety be resisted and litigated, the Undersigned shall: (I) give notice to the Surety to this effect; (ii) simultaneously deposit with the Surety cash or other collateral satisfactory to the Surety in an amount determined by the Surety to be sufficient to cover the claim or demand and interest thereon to the probable date of disposition plus attorneys' fees; (iii) or deposit simultaneously with the Surety cash or collateral satisfactory to the

6

> Surety; and (iv) take over the resistance and litigation of the claim or demand using competent counsel approved in advance by the Surety.

Filing No. 93, Agreement of Indemnity, 2nd paragraph ("Collateralization Provision"). The second paragraph is the Twenty-First paragraph and provides that "Each of the Undersigned hereby irrevocably nominate, constitute, appoint and hereby designate the Surety or persons designated by the Surety as his attorney-in-fact with the right to exercise all of his rights assigned, transferred or set over to the Surety by this Agreement. . . ." Filing No. 93, 21st paragraph ("Attorney-in-Fact Provision"). The third relevant paragraph to this matter, is the Twenty-Fifth paragraph that provides, "All rights and remedies of the Surety under this Agreement shall be cumulative, and the exercise of or failure to exercise any right or remedy at any time shall not be an election of remedy or a waiver of any other right or remedy." Filing No. 93, 25th Paragraph ("Non-Waiver Provision").

Cincinnati Insurance has now filed a motion with this court to enforce the settlement agreement. Cincinnati Insurance argues that it demanded collateral from the Indemnitors and that the non-waiver provision prohibits the court from finding waiver in this case. The Indemnitors counter that even if Cincinnati Insurance did not waive the Collateralization Provision, that it is unconscionable to enforce either the Collateralization Provision or the non-waiver provision. The Indemnitors also argue that if even if the Collateralization Provision was not waived, the amount of the settlement exceeds the amount of the performance bond, and as such, this court should not enforce the settlement agreement.

## DISCUSSION

### A. Choice of Law

As a preliminary matter, the Indemnitors indicate that the parties have a dispute as to whether Ohio or Nebraska law applies to the underlying lawsuit. However, the

7

Indemnitors admit that with regard to the issues associated with this motion, Ohio and Nebraska law are not in conflict.  Filing No. 96, p. 4-5.  When the legal principles involved in determining an issue are not in conflict, the court need not engage in a choice-of-law analysis.  *Phillips v. Marist Soc. of Washington Province,* 80 F.3d 274, 276 (8th Cir. 1996), *citing Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975) ("In the absence of a true conflict, *lex fori* controls").  Consequently, this court will apply Nebraska law.

## B. Validity, Waiver and Unconscionability of the Right to Settle Clause

Parties are free to settle lawsuits and the law favors and encourages settlements. *Hage v. General Service Bureau*, 306 F. Supp. 2d 883, 888 (Neb. 2003).  Settlements will be enforced unless they are the product of fraud, error, or mistake.  *Id.* Moreover, "a settlement agreement is subject to the general principles of contract law."  *Id.* at 889.  A district court has the power to enforce a settlement agreement reached in a case that was pending before it.  *Cruz v. Korean Air Lines Co.*, 838 F. Supp. 843, 845 (S.D.N.Y. 1993); *see also Strategic Staff Management, Inc. v. Roseland*, 619 N.W.2d 230 (Neb. 2000) (holding that a Nebraska court has the authority to enforce a settlement agreement reached in a case pending before it).

"An indemnity agreement is a contract to be construed according to the principles generally applied in construction or interpretation of other contracts."  *Oddo v. Speedway Scaffold Co.*, 443 N.W.2d 596, 602 (Neb. 1989) (*citing Union Pacific RR. Co. v. Kaiser Ag. Chem.Co.*, 425 N.W.2d 872, 879 (Neb. 1988)).  "In construing an indemnity contract, the terms and language used must be given fair and reasonable interpretation, the contract read in its entirety, and consideration given not only to the contract's language but also to the situation of the parties and circumstances surrounding them at [the] time of making the

contract." *Woodmen of World Life Ins. Soc. v. Peter Kiewit Sons' Co.*, 241 N.W.2d 674, 678 (1976) (*citing Currency Services, Inc. v. Passer*, 133 N.W.2d 19, 21-22 (Neb. 1965)).

Cincinnati Insurance argues that the indemnity agreement unambiguously allows it to pay or compromise claims and suits arising on the performance bonds, unless the Indemnitors give notice that a claim should be resisted and litigated and deposit collateral sufficient to cover the claim.[1]  The Indemnitors do not contest Cincinnati Insurance's right under the Collateralization Provision, but instead argue Cincinnati Insurance waived that right.

Despite their failure to provide Cincinnati Insurance collateral as required by the Agreement of Indemnity, the Indemnitors argue that Cincinnati Insurance waived the Collateralization Provision by defending this action for one and one-half years.  "Waiver" is a voluntary and intentional relinquishment of a known, existing legal right or conduct from which such relinquishment can be inferred. *Stuhr v. Stuhr*, 481 N.W.2d 212 (1992); *Licht v. Association Servs., Inc.*, 463 N.W.2d 566 (1990). To establish the waiver of a legal right, there must be clear, unequivocal, and decisive action of the party showing such purpose, or acts which amount to an estoppel. *Bowman v. City of York*, 482 N.W.2d 537, 546 (Neb.1992) (*citing Jelsma v. Scottsdale Ins. Co.*, 437 N.W.2d 778, 785 (Neb. 1989).  There is no indication or evidence that Cincinnati Insurance clearly and unequivocally waived its right to demand collateralization.  First, Cincinnati Insurance demanded collateralization

---

[1] Even if the right were contested, the court finds the holding in *Bell BCI Company v. Old Dominion Demolition Corp.*, 294 F. Supp. 2d 807 (E.D. Va. 2003), persuasive in this matter.  In *Bell*, the court held that under the terms of a similar indemnity agreement, the surety became the principal's attorney-in-fact, with the right and power to exercise all the rights assigned under the indemnity agreement. *Id.* at 814. The affidavit of Michael F. Fox indicates that Cincinnati Insurance reasonably believes it is liable on the performance bonds and that Cincinnati Insurance has notified the Indemnitors of their obligation to provide collateral.  Both sides agree that the Indemnitors have not provided that collateral.  Consequently, Cincinnati Insurance would have the right to settle the Wilkinson claim.

9

under the terms of the indemnity agreement on December 14, 2005. Filing No. 94, Exhibit C. Additionally, Cincinnati Insurance filed a third-party complaint in this matter to enforce the requirement that the Indemnitors deposit collateral equal to the claim amount. Finally, the Agreement of Indemnity specifically provides "the exercise of or failure to exercise any right or remedy at any time shall not be an election of remedy or a waiver of any other right or remedy." Filing No. 93, Exhibit B, ¶ 25.

The Indemnitors argue that the court should determine that the non-waiver provision is unconscionable under *Myers v. Nebraska Inv. Council*, 724 N.W.2d 776, 799 (Neb. 2006). While the Indemnitors' statement of law is correct, their application is not. In *Myers*, the Nebraska Supreme Court held that a contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract and is not procedurally unconscionable unless there is disparity in respective bargaining positions of parties to a contract. *Id.* (citation omitted). In this case, there is no evidence that either exists. The Indemnitors do not, nor can they, claim that contract terms were not grossly unfair when the contract was entered into, nor can they argue any disparity in bargaining position. The Indemnitors' arguments that Cincinnati Insurance "sat on its hands" while the Indemnitors engaged in protracted litigation, even if true, do not render enforcement of the non-waiver provision unconscionable.[2] Cincinnati Insurance may settle Wilkinson's claims in its own right, and as attorney-in-fact for HPM. Therefore, the court determines that Cincinnati Insurance did not waive the Collateralization Provision's requirements, the Indemnitors failed to provide

---

[2] It is unclear whether the Indemnitors are claiming that the Collateralization Provision and the Attorney-in-Fact Provision are also unconscionable. However, the court would hold those provisions not to be unconscionable for the same reasons the court determines that the non-waiver provision is enforceable.

10

collateral as required by the provision, and consequently, Cincinnati Insurance has no duty to litigate this matter.

### C. Settlement Amount

The Indemnitors argue that the full amount of the settlement is greater than the amount of the surety bond by $12,699, and thus, the settlement is invalid. The settlement agreement provides that Cincinnati Insurance will pay $1,000,000 on the performance bond, and that the letters of credit will be released to Wilkinson totaling an additional $423,130. The performance bond is limited to the amount of the bond, $1,410,431; however, it is "subject to the commitment by the owner to the mitigation of costs and damages on the Construction Contract." Filing No. 1, Exhibit 3. Cincinnati Insurance paid the settlement of $1,000,000 and released the contract balance. Consequently, Wilkinson is entitled to the release of the letters of credit as the balance of the contract price. Because the actual amount paid on the performance bond is less than the bond amount, the court will enforce the amount of the settlement agreement.

### D. Ancillary Claims

"Any party or the court may, at any time, raise the issue of subject matter jurisdiction." *GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 828 (8th Cir. 2004). "A district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if: . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(3). Cincinnati Insurance moves to dismiss the remaining cross-claims and third-party claims. No one has filed any opposition to Cincinnati Insurance's request to dismiss these claims. Because the claims which provided the basis for original jurisdiction have been settled, this court declines to exercise

jurisdiction over the remaining cross-claims and third-party claims, and dismisses them without prejudice.

IT IS ORDERED that Cincinnati Insurance's motion to enforce a settlement agreement and to dismiss ancillary claims, Filing No. 92, is granted.  The court hereby dismisses the ancillary claims without prejudice.

DATED this 14th day of April, 2008.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge